United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Peter Hansen, | NO. C 05-02995 JW |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Nestlé Waters North America, Inc., | |
| Defendant. / | |

## I. INTRODUCTION

Plaintiff Peter Hansen ("Plaintiff") filed this diversity suit against Nestlé Waters North America ("Defendant" or "Nestlé") alleging employment discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a). Presently before the Court is Defendant's Motion for Summary Judgment. (hereafter, "Motion," Docket Item No. 28.) The Court conducted a hearing on October 30, 2006. Based on the papers filed to date and arguments of counsel at the hearing, the Court GRANTS Defendant's Motion for Summary Judgment.

## II. BACKGROUND

**A.     Statement of Undisputed Facts**

Defendant bottles, sells, and delivers spring water to commercial and residential customers. (Declaration of Baldwin J. Lee, "Lee Decl.," Docket Item No. 30, Ex. C.) In California, it sells water primarily under the Arrowhead brand. (Lee Decl., Ex. C ¶ 4.) Prior to 2002, however, it acquired and separately operated the Black Mountain Spring Water Company. (Lee Decl., Ex. C ¶

8.) Defendant hired Plaintiff on September 5, 2001, as a Route Sales Representative ("RSR") for its Black Mountain facility located in San Jose. (Lee Decl., Ex. A - Plaintiff's Deposition, "Pl.'s Dep.," at 33-34; Ex. C ¶ 9.) Driving a commercial vehicle constitutes an essential function of the RSR position. (Pl.'s Dep. at 35-36; Lee Decl., Ex. C ¶ 5.) Thus, all RSRs must possess a valid commercial driver's license ("CDL"). (Lee Decl., Ex. C ¶ 5.) When Plaintiff came to work at Black Mountain, he possessed a CDL and, in his words, "had the ability to do the job." (Pl.'s Dep. at 35-36.) In November 2001, however, less than two months after being hired, Plaintiff suffered a grand mal seizure on a Sunday while at church. (Pl.'s Dep. at 34, 37, 48.)

The day after having the seizure, Plaintiff sought medical treatment. (Pl.'s Dep. at 34, 37, 38.) In accordance with the law, his physician notified the Department of Motor Vehicles of Plaintiff's seizure. (Pl.'s Dep. at 38.) The DMV suspended Plaintiff's license, and Plaintiff commenced a voluntary leave of absence from his job. (Pl.'s Dep. at 38.) Plaintiff's leave of absence was not prompted by any physical limitation or incapacity to perform his job. (Pl.'s Dep. at 37, 48.) It was solely due to the fact that without his license, he could no longer legally drive a truck for Black Mountain. (Pl.'s Dep. at 48.)

In November 2001, Plaintiff visited a neurologist who prescribed Plaintiff an anti-convulsion medication to control his seizures. (Pl.'s Dep. at 39, 40-41, 43, 47.) In April 2002, Plaintiff experienced a second grand mal seizure. (Pl.'s Dep. at 38, 40.) In the four years since that time, however, Plaintiff has remained seizure-free. (Pl.'s Dep. at 38, 40.) Plaintiff has been able to control his seizures through the use of Tegretol XR. (Pl.'s Dep. at 40-41, 43-44.) Since April 2002, Plaintiff's health has been good and there has been nothing limiting about his physical condition. (Pl.'s Dep. at 45-46.)

During his entire leave of absence from work, Plaintiff stayed in contact with the "appropriate" people at Black Mountain, keeping them advised of his "medical situation and its natural progression." (Pl.'s Dep. at 37, 57-58, 78-79, 81.) Initially, Plaintiff spoke to his former supervisor at Black Mountain once every couple of weeks. (Pl.'s Dep. at 79.) Plaintiff informed the

2

supervisor that to get his license back, the state required him to go for six months without a seizure, and that, in accordance with doctor's orders, he regularly took the necessary medication to prevent further seizures. (Pl.'s Dep. at 69-70, 79.) Defendant consistently responded positively to Plaintiff's reports, stating: "That's good, keep it up, we want you back. Take care of yourself, do the right thing." (Pl.'s Dep. at 79.) After the seizure of April 2002, Plaintiff informed his former supervisor that he would be re-eligible to apply for his commercial driver's license within six months of that seizure. (Pl.'s Dep. at 80.)

In April 2002, Defendant closed the Black Mountain plant facility where Plaintiff had worked, discontinued the brand, and merged all Black Mountain and Arrowhead operations into two Arrowhead facilities in the San Francisco Bay Area under the single Arrowhead brand. (Lee Decl., Ex. C ¶ 11.) As part of the closure, Defendant agreed that former Black Mountain drivers who elected not to move to the Arrowhead operations were entitled to a severance package. (Lee Decl., Ex. C ¶ 12.)

Around the time of consolidation, another individual replaced Plaintiff's former supervisor and became Plaintiff's contact person. (Pl.'s Dep. at 81-82.) Plaintiff does not recall whom he contacted at Arrowhead, but he continued to maintain regular verbal contact with this new individual approximately once a month for the purpose of indicating that he was taking all of his medication, that he had not had a seizure, and that he wanted to come back to work. (Pl.'s Dep. at 81-82.) Plaintiff's discussions with this individual always revolved around Plaintiff's return to work. (Pl.'s Dep. at 85.) The individual informed Plaintiff to keep doing what he was doing and not to worry about his job, "so we can have you come back." (Pl.'s Dep. at 85.) Plaintiff admits that every time he communicated with Defendant during the entire leave period, the individuals with whom he spoke encouraged him to come back to work, indicated that they wanted him to come back to work, or told him that he should not worry about his job. (Pl.'s Dep. at 79, 86, 90-91, 93-95, 100-01, 102-03, 116-17.)

Near the end of 2002, Plaintiff and Rita Sharma ("Sharma"), Arrowhead's Human Resources Manager, entered into discussions regarding Plaintiff's return to work. (Pl.'s Dep. at 85.) Plaintiff believes that upon learning that Sharma "had taken over," he called Sharma to let her know that he would do "everything possible so that I could return to work." (Pl.'s Dep. at 90-91.) Sharma sent Plaintiff a certified letter dated November 21, 2002, asking him to contact her regarding his "disability situation and any return to work options." (Pl.'s Dep. at 91-93.) When Plaintiff and Sharma spoke, Sharma explained to him that she needed to change Plaintiff in the system from an active employee on a leave of absence to an inactive employee.[1] (Pl.'s Dep. at 94-95.) Sharma explained to Plaintiff that he would have the assistance of Arrowhead in obtaining his license and that to come back to work as an RSR he needed to be able to drive and to possess a Class B license. (Pl.'s Dep. at 100-02.) Plaintiff believes that he spoke with Sharma off and on about his efforts to be able to return to work until the time he received a letter from the DMV lifting his restriction, which was at the end of May 2003. (Pl.'s Dep. at 102-03.)

After Plaintiff received the letter lifting his restriction from the state in June 2003, he spoke with Sharma by telephone. (Pl.'s Dep. at 98, 104.) Sharma informed him that the only open RSR position was at Arrowhead's South San Francisco branch. (Pl.'s Dep. at 104.) Later that June, Sharma and Plaintiff met at the South San Francisco facility so that Plaintiff could meet with the supervisor and tour the facilities. (Pl.'s Dep. at 104-05.) The supervisor of the South San Francisco facility explained to Plaintiff how Arrowhead would assist him in getting his Class B license through the DMV. (Pl.'s Dep. at 105-06.) Plaintiff recalls that he was offered a position, which he immediately accepted, but that Sharma told him to take the weekend to think about it. (Pl.'s Dep. at 106, 108.)

Plaintiff tried to contact Sharma the following Monday, but was unable to reach her. (Pl.'s Dep. at 108.) When Plaintiff finally reached Sharma on Tuesday, Sharma told him that he could not

---

[1] After an employee has exhausted all paid leave programs available, the employee is shifted from active to inactive status. (Lee Decl., Ex. C ¶ 14.)

4

1  accept the job. (Id.) Sharma said that since Plaintiff lived more than 50 miles away from the South
2  San Francisco facility, he was going to be given a severance package. (Id.) After this conversation,
3  Plaintiff performed a Mapquest search to determine the actual mileage between where he lived and
4  the South San Francisco facility. (Id.) His search revealed that the distance was 33 miles. (Id.) The
5  next day Plaintiff informed Sharma of this fact, and Sharma indicated she meant that he was being
6  given the severance package because he was more than 50 miles away from the Black Mountain
7  facility. (Id.) When he got off the phone with Sharma, Plaintiff performed another Mapquest
8  search and determined that this distance was less than 33 miles. (Pl.'s Dep. at 110.)

9  Subsequent to these conversations, Plaintiff received a severance letter from Sharma that was
10 dated June 26, 2003. (Lee Decl., Ex. B.) The letter provided the terms of the severance offer and
11 indicated that Plaintiff had 21 days to accept. (Id.) After receiving this letter, Plaintiff received a
12 message from Sharma in which she indicated that something had changed and that she wanted
13 Plaintiff to come back and start working the next week. (Pl.'s Dep. at 113-14.) By this time,
14 Plaintiff had consulted an attorney and decided that he did not want to work at Arrowhead. (Pl.'s
15 Dep. at 112-14.) Plaintiff neither accepted the severance offer nor returned Sharma's call. (Id.)

**B.   Procedural History**

On June 24, 2004, almost a year after his last contact with Defendant, Plaintiff filed a complaint of discrimination with the California Department of Fair Employment and Housing. Plaintiff's discrimination complaint indicated that Defendant fired him, or forced him to quit, and denied him employment. Plaintiff requested a right to sue letter. One year later, on June 20, 2005, Plaintiff filed the Complaint asserting a single cause of action for employment discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a).[2] (See Notice of Removal - Ex. A Complaint, "Compl.," Docket Item No. 1.) On July 22,

---

[2] Although Plaintiff alleges that Defendant failed to accommodate him, (see Compl. ¶ 10), Plaintiff does not plead a separate claim for failure to accommodate pursuant to Cal. Gov't Code § 12940(m). Accordingly, the Court only considers Plaintiff's claim for employment discrimination.

5

2005, Defendant removed this action to federal court on the basis of diversity jurisdiction. (See Notice of Removal.) Presently before the Court is Defendant's Motion for Summary Judgment.

### III. STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. If this burden is met, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element with respect to which the non-moving party bears the burden of proof at trial. Id. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. Masson v. New

Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255); Matsushita, 475 U.S. at 588; T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence."  T.W. Elec. Serv., 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587.

## IV.  DISCUSSION

Defendant contends that Plaintiff's sole claim for violation of FEHA fails for two reasons: (1) Plaintiff admits that Nestlé did not terminate him and (2) Plaintiff cannot establish causation because he has no evidence of discriminatory animus.  (Motion at 9.)

FEHA prohibits an employer from discriminating against an employee based on the employee's physical condition or disability.  See Cal. Gov't Code § 12940(a).  To establish a prima facie case of disability discrimination under FEHA, a plaintiff must show that he (1) suffered from a disability, (2) that he was otherwise qualified to do the job, and (3) that he was subjected to adverse employment action because of his disability.  Deschene v. Pinole Point Steel Co., 76 Cal. App. 4th 33, 44 (1999).  If the plaintiff establishes a prima facie case for discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions.  Id.  If the defendant carries this burden, "the plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated."  Id.

7

1    For the purposes of this motion, the parties do not dispute that Plaintiff can establish the first
2 two elements of a prima facie case of disability discrimination–namely, that he suffered from a
3 disability and was otherwise qualified to do the job. (See Motion at 9; Plaintiff's Opposition to
4 Defendant's Motion for Summary Judgment, "Pl.'s Opp'n," Docket Item No. 34, at 3.) The only
5 dispute remaining is whether Plaintiff has established that he was subjected to adverse employment
6 action because of his disability. (Motion at 9-11.)

7    California law applies the "materiality" test for defining an adverse employment action for
8 purposes of FEHA discrimination and retaliation lawsuits. See Yanowitz v. L'Oreal USA, Inc., 36
9 Cal. 4th 1028, 1036, 1050-51 (Cal. 2005.) The test requires an adverse employment action to
10 "materially affect[] the terms, conditions, or privileges of employment" to be actionable. Id. at
11 1051. Termination of employment constitutes an adverse employment action. Id. at 1054.

12    With respect to whether Plaintiff was terminated, the Court evaluated the following
13 evidence: (1) Plaintiff's testimony that Sharma sent him a letter that effectively terminated his
14 relationship with Defendant (Pl.'s Dep. at 114); (2) the severance letter that Plaintiff received, which
15 confirms "the arrangements . . . concerning [Plaintiff's] separation from Nestlé . . . ." (Lee Decl., Ex.
16 B); (3) Plaintiff's admission that he never received any documentation from Defendant explicitly
17 stating that he had been terminated (Pl.'s Dep. at 121); and (4) testimony from Defendant's director
18 of human resources that Plaintiff was never terminated and remains designated as an inactive
19 employee (Lee Decl., Ex. C ¶ 13). This conflicting evidence creates a factual issue as to whether
20 Plaintiff was terminated and thus, suffered an adverse employment action. For the purposes of this
21 motion only, the Court assumes that Plaintiff suffered an adverse employment action.

22    However, even assuming Plaintiff was terminated, the Court finds that there is no material
23 dispute as to causation because there is no evidence of discriminatory animus linking his disability
24 and the alleged discrimination. (Motion at 10.) As part of the prima facie case, a plaintiff must
25 show that the adverse employment action was taken because of his disability. Deschene, 76 Cal.
26 App. 4th at 44. A plaintiff must offer evidence that "give[s] rise to an inference of unlawful

8

1  discrimination." <u>Texas Dept. of Community Affairs v. Burdein</u>, 450 U.S. 248, 253 (1981).[3]  Proof

2  of discriminatory intent may be direct, circumstantial or inferred from statistical evidence, and all

3  evidence that the plaintiff submits can contribute to the inference in a cumulative manner.  <u>See</u>

4  <u>Stender v. Lucky Stores</u>, 803 F. Supp. 259, 319 (N.D. Cal. 1992.)

5      In this case, Plaintiff's only evidence of discriminatory termination is the statements made by

6  Sharma regarding the severance package and the 50-mile requirement.  (<u>See</u> Pl.'s Dep. at 109-110.)

7  Sharma's statements, however, do not support a finding of discrimination.  On their face, they are

8  simply an explanation of the necessary qualifications to receive severance benefits.  They are not, as

9  Plaintiff contends, "bogus" reasons that show Defendant decided to terminate Plaintiff because of

10 his disability.  (<u>See</u> Opp'n at 3.)  Plaintiff's contention, moreover, is undermined by the fact that

11 Defendant offered Plaintiff a job—one in which he declined to respond to—shortly after the

12 severance letter was sent out to him.  (<u>See</u> Pl.'s Dep. at 113-14.)

13     The Court finds that Plaintiff has failed to offer any evidence to support a prima facie case

14 for disability discrimination.  Accordingly, the Court dismisses Plaintiff's FEHA claim.

### V.  CONCLUSION

16     The Court GRANTS Defendant's Motion for Summary Judgment.

18 Dated: December 21, 2006

JAMES WARE
United States District Judge

---

[3] California courts look to pertinent federal precedent in applying FEHA in employment discrimination cases because FEHA is modeled after the federal antidiscrimination statutes.  <u>Guz v. Bechtel Nat., Inc.</u>, 24 Cal. 4th 317, 354 (2000).

United States District Court
For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Baldwin J. Lee blee@allenmatkins.com
Lindbergh Porter lporter@littler.com
Mary D. Walsh MDWalsh@littler.com
Patrick K. Palacios palacioslaw@earthlink.net
Richard H. Rahm rrahm@littler.com

Dated: December 21, 2006                    Richard W. Wieking, Clerk

                                            By:   /s/ JW Chambers
                                                  **Elizabeth Garcia**
                                                  **Courtroom Deputy**